## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

BOBBY RAY SNEED,

        Plaintiff,

    v.

LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS; JAMES M.
LEBLANC; COMMITTEE ON PAROLE;
FRANCIS ABBOTT, SHERYL M. RANATZA;
ANTHONY J. "TONY" MARABELLA; PEARL
WISE; TIMOTHY HOOPER; ERIC TURNER;
JONATHAN VINING;; LOUISIANA ATTORNEY
GENERAL JEFF LANDRY; CHRISTOPHER N.
WALTERS, GRANT L. WILLIS; WEST
FELICIANA SHERIFF'S OFFICE; BRIAN L.
SPILLMAN; HON. JOHN BEL  ITS
SHERIFEDWARDS; AND DOES 1-10,

        Defendants.

CASE NO.: 3:22-CV-00205

*Jury Trial Demanded*

## COMPLAINT

### I.    INTRODUCTION

1. This case is about whether Louisiana jailors may imprison a man they know ought to be free.

2. The United States Circuit Court for the Fifth Circuit has held, definitively, that jailors may not imprison inmates longer than their sentences. In fact, published and recent Fifth Circuit precedent recognized that **"There is a Clearly Established Right to Timely Release from Prison."**[1]

---

[1] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (emphasis in the original).

3.   Once a prisoner's sentence has expired, his jailor has a reasonable amount of time to process and release him. Federal courts have repeatedly held that the phrase "reasonable time" means some amount of time less than 48 hours.[2]  In other words, an inmate who has already served his entire court-ordered sentence must be released within a reasonable time not to exceed two days. Any minute more is unconstitutional and illegal.

4.   A jury is often asked to decide whether an overdetention of *less* than 48 hours is constitutional,[3] and juries have found that delay of as little as thirty minutes is unconstitutional.[4] But federal courts across the country have held, unequivocally, that a detention *beyond* 48 hours of an inmate's known sentence is unreasonable and illegal. Indeed, "[t]he [United States District Court for the Northern District of Georgia] has been unable to find **any case**, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible."[5]

5.   Plaintiff Bobby Ray Sneed should have been a free man on March 26, 2021. But because of the Defendants' unconstitutional and illegal overdetention practices, coupled with their collective questionable actions, Mr. Sneed did not walk out of detention on parole until January 8, 2022.

---

2  *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin."*). That is because once a detainee is ordered released, the public's interest in his prompt release is even greater, and the constitutional tolerance for "administrative delay" is substantially less than in the context of arrestees awaiting probable cause determinations – which must come within 48 hours. *See Berry v. Baca,* 379 F.3d 764, 771-72 (9th Cir. 2004); *Powell v. Barrett*, 376 F.Supp.2d 1340, 1353 (N.D.Ga. 2005),

3 *Berry v. Baca*, 379 F.3d 764, 77072 (9th Cir.2004) (twenty-nine hour delay presented question for jury); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two and a half hour delay presented jury question).

4  *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004).

5 *Powell v. Barrett*, 376 F.Supp.2d 1340, 1354 (N.D.Ga. 2005) (bolded emphasis added).

6.   Thus, Defendants Warden Timothy Hooper *et al*. unlawfully kept Plaintiff Bobby Ray Sneed wrongfully imprisoned for two hundred eighty-eight (288) days for beyond his Release Date to Parole, during which time defendants collectively conspired and carried out acts in furtherance of said conspiracy to continue to unconstitutionally detain Mr. Sneed.

7.   As federal district courts and federal courts across the country have held, Hooper et *al*.'s practices are unconstitutional and illegal.

## II.    OPERABLE FACTS

### A.  Bobby Ray Sneed's History

8.   Plaintiff, Bobby Ray Sneed, is a 74-year-old man who spent nearly 47 years at Louisiana State Penitentiary at Angola ("Angola").

9.    On March 15, 2021, Plaintiff unanimously won his parole.  However, Angola officials moved slowly in processing his release and continued to hold him in Angola after the parole board vote and after his residential plan was approved finally setting March 29, 2021 as his fixed release date to parole ("Fixed Release Date").

10. Unfortunately, on March 25, 2021, just days before his Fixed Release Date, impacted with COVID-19, pneumonia, sepsis, and hypoxia, and already compromised from the effects of a significant stroke he sustained while in prison, Mr. Sneed collapsed and became non-responsive to emergency medical treatment.

11. Fortunately, Bobby was eventually revived and stabilized, and was rushed to Lane Regional Medical Center in Zachary, Louisiana for additional medical care and observation.

12. Tests performed on Mr. Sneed during his four days at Lane Regional Medical Center, revealed the presence of opiates and methamphetamines in a urine sample taken from Mr. Sneed.

13. Four days later, March 29, 2021, Bobby Sneed's Fixed Release Date, instead of being released on parole from Lane Regional Medical Center, Mr. Sneed was returned to Angola and placed into "Administrative Segregation" in an area of Angola known as the "Dungeon," where Mr. Sneed was detained without his dentures or shoes for over a month, until his May 6, 2021 Disciplinary Board hearing on the alleged possession of contraband (narcotics) in his possession on March 25, 2021, the day Mr. Sneed collapse.

14. Prison records reflect that Mr. Sneed was

15. Based on a urine sample that may (or may not) have been extracted from an unconscious Mr. Sneed, prison officials alleged that Mr. Sneed possessed contraband (i.e., drugs) that caused his collapse.

## B. The LSP Disciplinary Proceeding

16.  Mr. Sneed's excessive confinement in the Dungeon ended on Wednesday, May 5, 2021, the day of he was brought before Angola's Disciplinary Board for adjudication for his alleged March 25, 2021, drug possession which according to the narrative perpetuated by Angola Officials, was the cause of Mr. Sneed's collapse/medical emergency.

17.  Initially, the Disciplinary Board denied all of Mr. Sneed's motions raising procedural objections, such as the failure to promptly adjudicate the Board's allegations and the failure to provide proper notice, and those motions seeking to confront his accuser, call witnesses, and conduct a further investigation (including to review his medical records).

18.  The Angola Disciplinary Board then read into the record that the chief evidence against Mr. Sneed was a presumptive positive test from a "ToxCup" urine test for amphetamine and

methamphetamine taken from Mr. Sneed by Angola officials after his collapse on March 25, 2021, and a subsequent laboratory test of that sample suggesting the additional presence of opiates.

19.  Mr. Sneed was then given the opportunity to present evidence which included evidence indicating Angola officials (1) fraudulently altered their "ToxCup" forms in Mr. Sneed's case; (2) mishandled the urine samples before they were sent to an outside laboratory; and (3) had no idea how, when, or if the purported urine sample was obtained from an unconscious Mr. Sneed.

20.  Because Mr. Sneed's medical records were withheld,  he was deprived on the opportunity to argue that other medications he was prescribed were responsible for generating any false positive results, if in fact the dubious urine sample was obtained from him.

21.  Specifically, Angola officials concealed (until May 11, 2021) that in addition of administering Narcan to Mr. Sneed early in their treatment of him, that they injected Mr. Sneed with morphine before taking him to an outside hospital, which explains the presence of any opiates in his urine.

22.  Many other drugs commonly administered to treat diabetes, high blood pressure, sinus and nasal congestion, and pneumonia can cause false positive tests for amphetamine and methamphetamine to occur.

23.  Three hours later, at the conclusion of the hearing, the Angola Disciplinary Board found Mr. Sneed "Not Guilty" with respect to the fabricated March 25, 2021 drug overdose.

24.  Unfortunately, in the same breadth in which Mr. Sneed was exonerated of the contraband charges, the Disciplinary Board confronted Mr. Sneed with another baseless charge ("being impermissibly present in the dormitory where Mr. Sneed collapsed on March 25, 2021").

25.  The very next day, May 6, 2021 Angola officials withdrew this charge the following day when they were forced to acknowledge Mr. Sneed was authorized to be there.

26.   At that time, Thursday, May 6, 2021, having been cleared of all pending charges, Mr. Sneed was once again poised to return home to spend his final years with his siblings, children, and grandchildren."

**C.  Defendant Abbott's Threats and Plea Bargaining**

27.   On the evening of May 6, 2021, Mr. Sneed's counsel at the time, Thomas Frampton, asked Defendant Abbott about Mr. Sneed's release, and, later that evening, Defendant Abbott called Mr. Frampton and stated that he (Abbott) "had the authority to revoke Mr. Sneed's parole despite the Disciplinary Board" and Abbott further stated that he did not have to give Mr. Sneed formal "notification" of the alleged misconduct giving rise to Defendants' Abbott/Parole Board/Committee on Parole assertion that they "had the authority to revoke Mr. Sneed's parole" despite Angola's Disciplinary Board's exoneration of Mr. Sneed on all charges.

28.   Defendant Abbott then "offered" to Mr. Frampton the rather Draconian proposal that if Bobby were to participate in the nine-month Steve Hoyle Intensive Substance Abuse Program located within the Bossier Parish, Louisiana Detention Center, that Defendant Board would "keep the matter open," and Mr. Sneed "*might* re-earn his parole" at some yet to be determined time in the future.

29.   On behalf of Mr. Sneed, during this same Thursday night conversation with Defendant Abbott, Mr. Frampton put Defendant Abbott on notice that he did not think Defendant Abbott "had the authority to engage in such negotiations on behalf of the Committee," but that he (Frampton) would nevertheless present the offer to Bobby Sneed (still incarcerated within Angola) noting that the ultimate decision would be made by Bobby Sneed.

30.   This so called "deal" for Mr. Sneed would have had the effect of Mr. Sneed pleading guilty to the Defendant-manufactured March 25, 2021 "drug overdose" and possession of

contraband charges, committing perjury at his May 5, 2021 Disciplinary Board hearing (where he was found "not guilty), and another nine (9) months of incarceration behind bars behind his March 29, 2021 Fixed Release Date, all <u>without</u> a definite future release date to parole.

31.   No agreement was reached as it was then late Thursday night, and Mr. Frampton did not have the opportunity to communicate Mr. Abbott's proposal to Mr. Sneed before the bizarre turn of events that commenced the next morning, Friday, May 7, 2021.

32.   Despite the absence of a settlement during Defendant Abbott's and Mr. Frampton's telephone conference on that Thursday, May 6, 2021, conversation to did provide Mr. Sneed and Mr. Frampton with some insight as to why Defendants Abbott and the Parole Board were taking such a unyielding position on Mr. Sneed's release to parole.

33.   Specifically, during this call, Defendant Abbott referred derisively to the ongoing press coverage of Mr. Sneed's case and stated it would not help Mr. Sneed before the Committee on Parole.

34.   Defendant Abbott also asked if the *Wall Street Journal* would cover the matter.

35. Based on these questions, it quickly became apparent to Mr. Frampton that Defendant Abbott (and likely other defendants) were acutely aware of the negative press coverage and critical statements by Mr. Frampton about Louisiana corrections officials surrounding Bobby Sneed's May 5, 2021, Disciplinary Board  hearing.

36.   By that Thursday evening, news coverage about Mr. Sneed's recent plight was generating substantial negative publicity about Louisiana corrections officials, including over 150,000 "views" on Reason.com and a thirty-minute segment on a New York City radio station.

37.   The online reactions to Louisiana corrections officials' actions was overwhelmingly hostile.

38.  One media outlet wrote "[o]n behalf of Mr. Sneed, his attorney made critical statements about Louisiana corrections officials, and was encouraging others to petition Secretary LeBlanc." (*Id.* (citing, *e.g.*, Billy Binion, *He Was Granted Parole After Servicing 47 Years Behind Bars. Now the Prison Won't Let Him Leave.* REASON, MAY 6, 2021 ("It feels like we've gone from tragedy to farce.").)

39.  One of Mr. Sneed's family members agreed to talk with journalists, but only if their name and gender was masked." (citing Nicholas Chrastil, *Angola Prison Who Faced Loss of Parole Cleared on Contraband Charges, but Now Faces New Disciplinary Action for Being in Wrong Dorm, Lawyer Says*, THE LENS, May 6, 2021).)

40.  This unflattering news coverage was very critical of Louisiana corrections officials and painted their actions surrounding Mr. Sneed's release to parole in a harsh light.

## D. Parole "Rescinded" or Revoked

### 1. The May 7, 2021, "Hearing"

41.  Approximately twelve (12) hours later, the next morning, Friday, May 7, 2021 at 7:30 A.M. CST, Defendant Abbott emailed Mr. Frampton the following message:

> "The Committee on Parole has made the decision to rescind its original decision to grant Offender Sneed parole and has scheduled Offender Sneed for a new parole hearing before a parole panel on Monday 5/7/21 [sic]."

A PDF letter was attached to the email with a file name "B Sneed Rescind Letter" which read:

Bobby R Sneed
DOC# 81275
Louisiana State Penitentiary
Hwy. 66
Angola LA  70712


Dear Bobby R Sneed:

This correspondence is to advise you that the Parole Board has voted to rescind the parole granted at your original parole hearing.

This action was taken due to the following:

We have been advised that you have admitted to drug usage after your original parole hearing.


You will be scheduled for another hearing on 05/10/2021.


Respectfully,

*[signature]*

Board of Parole

42.  Mr. Frampton immediately telephoned Defendant Abbott, who on that call, among other things, informed Mr. Frampton:

> (1) that, in fact, there had not been a real Board "vote," but rather, Mr. Sneed's parole had been taken unilaterally by Committee on Parole member Tony Marabella ("I presented the paperwork and he did the action"); (2) that no other members of the Committee on Parole were notified of this action ahead of time; (3) that the information that was provided to Defendant Marabella would not be shared with Mr. Sneed; and (4) that there was no audio recording, minutes, or other record of this *ex parte* proceeding involving him and Mr. Marabella.

43.  Defendant Abbott then advised Mr. Frampton:  "That's what happens. Mr. Sneed didn't want Steve Hoyle. That's the decision."

44.   That afternoon, a local newspaper quoted Defendant Abbott as saying, "[w]e have made the decision to rescind that parole."

45.   Defendant Abbott also refused to disclose the secret evidence to members of the press, and was quoted in a different publication stating: "[w]e've got documents that were submitted to the board that are not open to the public."

46.   A few minutes after the above notice, Mr. Sneed was sent a second letter regarding a "new" parole hearing he would have that was referenced in the earlier letter.  The letter said:

> "The Committee on Parole has scheduled your parole hearing [for 7:45AM] on 05/10/2021. . . . You or your representative may request, in writing, to continue or postpone your scheduled parole hearing for good cause. The request must be received in the Board's office no later than fourteen (14) days prior to the scheduled hearing date and must contain a specific reason(s) for the request."

## 2. The May 10, 2021, "Hearing"

47.   The Monday, May 10, 2021, hearing was held virtually by Zoom.

48.   Contrary to all of the above communications— the May 7, 2021, letter, the private exchanges between Defendant Abbott and Mr. Frampton, and Defendant Abbott's public statements — that "Marabella orally denied in the middle of the hearing that Mr. Sneed's parole had been 'rescinded.'"

49.    Additionally, another Board member (Alvin Roche) made contradictory and conflicting statements concerning whether Mr. Sneed's parole had been stripped, whether that question was the point of the hearing, or whether the hearing was intended to "attempt to legitimate Mr. Marabella's previously  taken action."

50.   Further, "[t]hroughout the event, members of the Committee . . . made statements indicating they had already discussed Mr. Sneed's matter in off-the-record settings."

51.   Specifically, Board member Roche said "there were some circumstances after [Mr. Sneed] was granted [parole] that caused us to rescind our decision," and, that following Mr. Sneed's denial, "Mr. Marabella confidently predicted that his colleagues' vote would 'likely' be to strip Mr. Sneed of his parole based on the private information they had already received."

52.   Through counsel, Mr. Sneed also tried to determine whether a formal "notification" of misconduct from a state official had caused the hearing or whether the Committee had done so at Defendant Abbott's prompting.

53.   Mr. Frampton again recited the provisions of the Louisiana Administrative Code requiring that the Committee on Parole receive " 'notification from the Secretary of the Department. . .' that Mr. Sneed had engaged in 'misconduct' before it could act."

54. Defendant Marabella did confirm that the Secretary had not been in contact with the Committee.

55.   However, further responding, Defendant Marabella continued by stating that a "representative" of the Secretary had given the required notification, although Defendant Marabella stopped short did not identify who the "representative" was or how and when this person contacted the Committee.

56.   Separately, over the weekend, Defendant Abbott told a reporter working on a story for the Washington Post that the required "notification" came from LSP Deputy Warden Tracy Falgout, to whom Secretary LeBlanc had delegated authority by affidavit for purposes of triggering Committee on Parole review of previously granted parole grants.

57.  In fact, no such delegation of authority or affidavit exists.  . . . . No "notification" to the Committee on Parole, from Secretary LeBlanc or anyone else, has been provided to Mr. Sneed.

58.  Through Mr. Frampton, Mr. Sneed repeatedly asked for a brief continuance because of the lack of notice, the need to review the "notification" the Committee on Parole had received, and the desire to obtain documents which Defendant Parole Board must share under Louisiana law, but the Committee on Parole denied Mr. Sneed's request, saying in part, "This hearing is very simple."

59.  Mr. Sneed also moved the Committee on Parole to consider the record from his three-hour Disciplinary hearing five (5) days earlier which cleared Mr. Sneed of any and all wrongdoing.

60.  At that point during the May 10, 2021 hearing Defendant Marabella exclaimed: "We're going forward today! . . . The record is clear. Now we're moving forward with the hearing. Does your client wish to talk?"

61.  Although Mr. Frampton explained to the Defendant Committee on Parole that Mr. Sneed had suffered a debilitating stroke while in prison and thus had trouble speaking, Defendant Committee on Parole denied Mr. Sneed's request to allow Mr. Frampton to make statements and answer questions on his behalf.

62.  Instead, Defendant Committee on Parole merely allowed Mr. Sneed to confer privately with Mr. Frampton for two (2) minutes (which was the first time Mr. Sneed had been given any opportunity to speak with his legal counsel since the events of the previous Wednesday, the date of the Angola Disciplinary hearing where Mr. Sneed was exonerated of any and all charges or allegations of wrongdoing.

63.  Thereafter, Defendant Marabella then immediately began aggressively questioning Mr. Sneed, which questioning amounted to the entirety of the evidence presented and adduced at the hearing.

64.  Defendant Marabella's ("TM") and Mr. Sneed's ("BS") colloquy then proceeded as follows:

TM:  You received a life sentence for the murder of Curtis James. You've been in prison for 47 years. Is that correct?

BS:  Yes, sir.

TM:  Mr. Sneed, the parole board held a lengthy hearing on March 15, 2021, hearing both support and opposition [sic], and recommended [sic] parole with certain conditions. Do you recall that?

BS:  Yes, sir.

TM: Ten days later, you were found unresponsive. CPR was administered, as well as Narcon [sic]. After medical intervention, you were breathing and transported to the medical center. At which time, while at Lane Memorial Hospital, part of your admission to the Lane Memorial Hospital, as part of your history of what happened, you indicated to them that you injected heroin earlier in the day. Is that correct?

BS: No, sir.

TM:  Oh! You didn't say that?!

BS: No, sir.

TM:  You didn't inject something that you thought was heroin on that day?

BS: No, sir.

TM:  You did inject methamphetamines, didn't you?

BS: No, sir.

TM:  So you're denying what you told the medical records?

BS:  I was unconscious. I didn't tell the medical records anything.

TM:  Mr. Sneed, you were transported breathing to Lane Memorial Hospital, at which time you were interviewed by the doctors and the medical staff there, and you indicated to them that you had injected heroin earlier in the day and you later tested positive for both methamphetamines and amphetamines.

BS:  No, sir.

TM:  You didn't?

BS:  No, sir.

TM:  That's what you're telling us today? The records indicate otherwise.

65.  After Defendant Marabella's final question Mr. Frampton interjected: "I have to object again. We have no idea what records the parole board is referring to. We've repeatedly asked for them, again and again, and been denied by prison authorities and by Mr. Abbott. So I'd ask, if the board would like Mr. Sneed to respond to specific allegations that we have notice of what . . ."

66.  At that point during the hearing the very spirited Defendant Marabella interrupted Mr. Frampton, exclaiming: "I just asked him the specific questions and he has denied them," and further stated: "We're not guessing! We have hard facts that we're relying on today. Now, your client has denied all of these things, and we accept that, and that's in the record."

67.  Defendant Marabella later stated "[w]e have information. This hearing is about the actions of your client [Mr. Sneed] on that particular day [March 25, 2021]."

68.  The Committee on Parole then denied additional requests to call witnesses and introduce evidence.  Defendant Marabella did state that he would give Mr. Frampton just three

(3) minutes to make a closing statement, but, ended up cutting Mr. Frampton off after 2 minutes and 15 seconds, finding that "[Mr. Frampton] made [his] points."

69.  Mr. Frampton then told the Committee on Paroled of Abbott's May 6, 2021, plea offer and urged that it was unfair to punish Mr. Sneed because he refused to accept a plea bargain he never had an opportunity to accept.

70.  Mr. Frampton specifically informed the Committee on Parole that he hadn't spoken yet with Mr. Sneed [on Friday, May 7 when Mr. Abbott's letter arrived] and still hadn't spoken with Mr. Sneed prior to the commencement of the May 10, 2021 hearing.

71.  Mr. Frampton went on to explain to the Committee on Parole that the very hearing that was in progress was literally the first time Mr. Sneed had heard about the specious May 6, 2021 plea offer.

72.  Mr. Frampton continued that it was highly improper to penalize or punish Mr. Sneed based on a potential resolution for which Mr. Frampton was precluded to communicating to Mr. Sneed, particularly considering the fact that Mr. Sneed's answer would likely determine whether he walked out of Angola, or was delivered to his family in a body bag.

73.  At this point in the proceedings, Defendant Marabella interrupted Mr. Frampton and physically turned off his microphone preventing Mr. Frampton from further commenting to the Committee on Parole, a recognized "public body" at this May 10, 2021 parole hearing, which defendants concede constituted an "open meeting" as defined by La. R.S. 42:11, *et seq,* the body of Louisiana law known as the "Open Meetings Law."

74.  Mr. Sneed further avers that the Committee on Parole, and particularly the manner in which Defendant Marabella conducted this so called "hearing" coupled with the affirmative actions he took to silence Mr. Frampton, and thus Mr. Sneed and preclude him from presenting a

meaningful defense to charges for which Angola's Disciplinary Board already found Mr. Sneed innocent, constitutes a violation of Article XII, Section 3 of the Louisiana Constitution (1974) which grants Louisiana citizens the right to direct participation in the business of public bodies, including the "right to observe the deliberations of public bodies and examine public documents."

75.  As Defendant Marabella brought the hearing to a close, he addressed Mr. Sneed and stated:

> "You were granted parole. 10 days later you overdosed . . . . Today
> my vote is going to be to deny your parole." Another member stated
> that "based on the information that's been provided today, for today,
> in preparation for today's hearing, my vote today is to deny you
> parole."

76.  The Committee on Parole then voted 5-0 to "deny" Mr. Sneed's parole, with not a single member of the committee referring to "rescinding" Mr. Sneed's parole, and no member providing any details on the nonpublic information Defendant Abbott provided to the Committee on Parole in its May 10, 2021 consideration of Bobby Sneed's parole.

**E. Post-Hearing Discoveries**

77.  The following day, Tuesday, May 11, 2021, Defendant Department of Public Safety and Corrections provided Mr. Sneed's medical records from Lane Regional Medical Center, which had purportedly been withheld for the past month.

78.  These records support the conclusion that Mr. Sneed collapsed due to COVID-19, pneumonia, and hypoxia, rather than the drug overdose prison officials assumed, and alleged in their fabricated narrative.

79. Further, and quite contrary to the line of questions Defendant Marabella peppered Mr. Sneed with at his second "parole hearing" the day before, Mr. Sneed's medical records corroborated, as Mr. Sneed testified, that when he was admitted to Lane Regional Medical Center on March 25, 2021, he was "lethargic and unable to participate in his HPI ['History of Present Illness']," did not remember anything of March 25, 2021, and was unconscious during his interactions with medical personnel.

80. The next day, Wednesday, May 12, 2021, Mr. Sneed's counsel, Mr. Frampton spoke with Dr. Jess Anderson, M.D., Mr. Sneed's Attending Physician while he was at Lane Regional Medical Center between March 25, 2021 and March 29, 2021.

81. Dr. Anderson, who was first identified through the belatedly disclosed medical records stated to Mr. Frampton that:

> (1) that she remembered Mr. Sneed well;

> (2) that neither she nor the Nurse Practitioner who treated Mr. Sneed recalled Mr. Sneed making any admission regarding drug use during his hospital stay;

> (3) that it "didn't make sense" that Mr. Sneed would be the source of the purported confession given that he was "unable to participate in HPI; and

> (4) that if Angola employees, rather than Mr. Sneed, told hospital doctors that Mr. Sneed had acknowledged drug use (perhaps passing along rumors they had heard or fabricated), such information could appear as it did in Mr. Sneed's Admission Notes.

## F. Judicial Relief in State Court

82. Following the uncontainable events of May 5-10, 2021, on May 14, 2021, while still in the indefinite custody of Defendant Louisiana Department of Public Safety and Corrections, Bobby Sneed caused his legal counsel Thomas Frampton, to file a Complaint in the United States District Court for the Middle District of Louisiana against Defendant Abbott, and Defendant

Louisiana Committee on Parole.  Said suit was docketed as Case No. 3:21-cv-00279 and assigned to District Court Judge John W. deGravelles and Magistrate Judge Richard L. Bourgeois, Jr.

83.    However, although commenting that if the allegations in Mr. Sneed's First Amended Complaint were true, "Defendants' flagrant disregard of procedural norms in the two hearings at issue, [was] at best, irregular, and at worst, reprehensible," on July 20, 2021, Judge deGravelles ruled that he was bound by the controlling precedent cited in defendants' *Motion to Dismiss Pursuant to F.R.C.P. Rule 12 (b) (6)*, which mandated that Mr. Sneed exhaust his state *habeas corpus* remedies before seeking relief in federal court, thereby granting Defendants' motion and dismissing Mr. Sneed's complaint.

84.    On September 29, 2021, Mr. Sneed filed a state court petition seeking a writ of habeas corpus in the Nineteenth Judicial District Court for the Parish of East Baton Rouge,  again contenting that he continued to be over-detained beyond his March 29, 2021 Fixed Release Date, and that they Board on Parole acted unlawfully when it sought to strip Mr. Sneed of his previously granted parole in May during an extraordinarily irregular series of proceedings.  Said suit was docketed as Case No. C-711804 and allocated to the Honorable Ronald R. Johnson in Division L of that court.

85.    Soon thereafter, the Court scheduled an initial status conference with the parties; respective legal counsel, where the Court set a briefing schedule on the matter and an in-person hearing on Mr. Sneed's habeas petition for the afternoon of October 26, 2021.

86.    At the conclusion of the two-hour hearing on October 26, where Mr. Sneed was present, the Court first heard defendants' exceptions to Bobby Sneed's habeas petition, then heard

argument on Mr. Sneed's summary proceeding, taking all of matters under advisement and solicited post-hearing briefs from the parties.

87.   On November 18, 2021, the state trial court issued a ruling ordering Mr. Sneed immediately released, rejecting defendants' exceptions and finding that the Board on Parole violated state law when it stripped Mr. Sneed of his parole, but remained silent on his federal constitutional claims.

88.  Specifically, the trial court made the following factual findings:

> According to the record herein, Sneed, the Petitioner, appears before the Louisiana Parole Board on March 15, 2021, during which a hearing was held and the Board voted unanimously to grant Mr. Sneed's parole with a scheduled release date of March 29th, 2021.  Prior to Mr. Sneed's scheduled release date, on March 25th, 2021, Mr. Sneed becomes ill and is transported off of prison grounds to a hospital for treatment.  Subsequent to Mr. Sneed receiving treatment, he is returned to the grounds of Angola Prison and is held there.  On March 26th, of 2021, Francis Abbott . . . the Executive Director of the Louisiana Parole Board, sends a letter to prison officials to stop Mr. Sneed's release.  As a result, Mr. Sneed's scheduled release date comes and goes without him being released.

89.   These findings were correct and subsequently affirmed by the Louisiana Supreme Court.

90.  Less than fifty-five (55) minutes before Mr. Sneed was set to leave Angola prison on November 23—looking forward to his first Thanksgiving dinner with family in 47 years—the Louisiana First Circuit Court of Appeal granted Respondent Francis Abbott and Respondent Board of Parole's emergency writ application.

91. The court failed to rule on Mr. Sneed's motion to dismiss for lack of standing, because Warden Hooper did not object or seek review of the ruling. The First Circuit accepted

Respondents' argument in whole: it didn't matter if state officials violated state law *or* the U.S. Constitution, because Louisiana courts simply lack the power to grant relief to a prisoner in Mr. Sneed's situation.

92.   Fortunately, that terrifying opinion was subsequently reversed by the Louisiana Supreme Court. The Louisiana Supreme Court's *per curiam* opinion rejected Defendants' principal legal argument that they have advanced since May 2021 and clarifies the appropriate legal status of what occurred to Mr. Sneed:

> Factually and legally, this matter presents in a complicated and complex manner and is, therefore, dependent for resolution on its own unique circumstances. Petitioner, who was granted parole and scheduled for release on March 29, 2021, was hospitalized after collapsing on March 25, 2021. Upon his discharge from the hospital, he was not released, but returned to prison. In connection with the March 25 incident, Petitioner was issued a disciplinary report for violating a conduct rule barring contraband, but following a hearing before the Louisiana State Penitentiary Disciplinary Board on May 5, 2021, Petitioner was found 'not guilty' of possessing contraband. Nonetheless, on May 7, 2021, a member of the Committee on Parole executed a single-member action to rescind the Committee's prior decision . . .

> The rules adopted by the Committee on Parole provide for rescission of a prior grant of parole pursuant to a single-member action. [Cite omitted.] However, here the Committee did not act to rescind petitioner's parole prior to his release date. As a result, Petitioner was held in physical custody after his release date.

> Petitioner's limited liberty interests attached once his release date passed. See, *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). For that reason, we find rescission was not available here. Rather procedural due process dictates that petitioner was entitled to a revocation hearing. . . .

> *Sneed v. Hooper*, No. 2021-KK-01776 (La. 12/07/21)

93.  With this ruling from the Louisiana Supreme Court, the First Circuit's decision was "reversed, and this matter [was] remanded to the district court for further proceedings consistent [therewith]."

94..  Still unmoved by the Supreme Court's opinion, and even underscoring that the high court's opinion was merely a *per curiam* opinion with eye-roll defiance, Defendants "doubled-down" on the morning of December 9, 2021 during another lengthy hearing before Judge Johnson at which point Defendants announced that "new information" had come to light and they planned to apply for a rehearing before the Louisiana Supreme Court.[6]

95.  Nevertheless, after a lengthy discussion regarding the procedural posture of the case, the trial court made additional factual and legal findings, and then reinstated its previous order in open court at approximately 10:00 a.m. on the morning of Thursday, December 9, 2021:

> This matter again came under this Court's jurisdiction on remand from the Louisiana Supreme Court, *Sneed v. Hooper*, No. 2021-KK-01776 (La. Dec. 7, 2021) where the Supreme Court reversed the First Circuit Court of Appeal's vacation of this Court's November 18, 2021 ruling, granting Petitioner's Writ of Habeas Corpus and further ordering Defendant Tim Hooper, Warden of the Louisiana State Penitentiary at Angola, Louisiana, to immediately release Mr. Bobby Sneed (DOC # 81275). Considering the forgoing and the further respective arguments made by the parties in open court on December 9, 2021,
>
> **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that this Court's previous order of November 18, 2021 is maintained: the writ of habeas corpus is **GRANTED** and Respondent Hooper is **ORDERED** to immediately release Mr. Sneed from the custody of the Louisiana State Penitentiary at Angola, Louisiana; and

---

[6] Mr. Sneed Points out that there is no such thing as a "rehearing" of a grant of a supervisory writ. *See* La.S.Ct. Rule IX § 6 ("An application for rehearing will not be considered when the court has merely granted or denied an application for a writ of certiorari or a remedial or other supervisory writ . . . "); *see also* State ex rel. Jones v. State, 2014-1664 (La. 10/23/15), 177 So. 3d 1058; In re Succession of Roussel, 2004-1940 (La. 1/14/05), 889 So. 2d 252; State v. Kennon, 2019-00998 (La. 9/1/20); State v. Jones, 2019-00533 (La. 10/6/20), 302 So. 3d 520, 522.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED** that Louisiana Code of Criminal Procedure art. 370 (requiring stay until "forty-eight hours after the judgment ordering the release has been entered or *until an application by the state for supervisory writs has been denied, whichever occurs first*") (emphasis added) shall not be invoked by defendants to further delay Mr. Sneed's release from custody. As the Louisiana Supreme Court correctly held:

> "[P]etitioner was held in physical custody after his release date. Petitioner's limited liberty interests attached once his release date passed. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). For that reason, we find rescission was not available here. Rather, procedural due process dictates that petition was entitled to a revocation hearing[.]"

*Sneed v. Hooper*, No. 2021-KK-01776 (La. Dec. 7, 2021); and

**IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED** that consistent with the Supreme Court's decision, this Court also finds that under *Morrissey v. Brewer*, the "minimum requirements of due process" in the parole revocation context require "disclosure to the parolee of evidence against him," the "right to confront and cross-examine adverse witnesses," a "neutral and detached" hearing body, and a "written statement by the factfinders as to the evidence relied on." 408 U.S. at 489. Because it is undisputed that no such procedures were followed when Mr. Sneed's parole was stripped—indeed, Respondents' position was that they did not need to afford Mr. Sneed a proper revocation hearing—this Court finds that Mr. Sneed was deprived of "liberty" without due process of law, and his ongoing confinement offends the Fourteenth Amendment. Having considered the arguments of the parties, this Court further finds that its initial determination that Mr. Sneed was improperly detained past his release date of March 29, 2021 (based upon the evidentiary record, including emails from Respondent Abbott and representations of Respondents' counsel regarding what was due to occur on March 29, 2021 absent the contraband allegations)—which has now been affirmed by the Louisiana Supreme Court—remains correct.

**g. Willful and Wanton Defiance Defendants Louisiana Department of Public Safety and Corrections; Defendant James M. LeBlanc, Defendant Timothy Hooper, and Defendant Jonathan R. Vining**

96.  Despite the Court's oral order  from the bench on the morning of Thursday, December 9, 2021, Defendants Louisiana Department of Public Safety and Corrections; Defendant James M. LeBlanc, Defendant Timothy Hooper, and Defendant Jonathan R. Vining took no steps to facilitate Mr. Sneed's "immediate release" from Angola.

97.  At 10:03 a.m., Department of Public Safety and Corrections General Counsel, Defendant Jonathan R. Vining emailed Mr. Sneed's legal counsel, Mr. Frampton, and Mr. Schmidt:

> "It takes time to process out-so 5PM at a minimum please-thats assuming he signs today I suppose?"

98.  Two (2) minutes later at 10:05 a.m., Mr. Sneed's counsel Mr. Frampton responded:

> Jonathan:
>
> We'll be happy to agree to any delays if you agree not to use that extra time to thwart his release.  I suspect that's not on the table; yet another reason I think your co-counsels should communicate with us.
>
> Thomas

99.  Neither Mr. Vining, nor Mr. Walters or Mr. Willis, legal counsel for the Committee on Parole responded to Mr. Frampton's 10:05 a.m. email on Thursday, December 9, 2021.

100.  Despite this lack of a response by Defendants Vining, Walters and Willis, based on the representations made by DPSC General Counsel Defendant Vining during that morning's hearing, at approximately 2:30 p.m. on that December 9th afternoon, undersigned co-counsel for Mr. Sneed, Justin B. Schmidt, got in his vehicle in New Orleans and started driving toward Angola to be waiting for Mr. Sneed at his release at 5:00 p.m.

101.  At 3:24 p.m., Mr. Frampton again reached out to DPSC General Counsel Defendant Vining to ask **"is everything in place?  Who's our contact person tonight?"**

102.   DPSC General Counsel Defendant Vining responded immediately:  **"I'm going through hooper-I'm out of the office but I can reach him-"**

103.  At 4:12 p.m., the Court emailed a written version of its earlier oral order, and Mr. Sneed's counsel, Thomas Frampton, immediately confirmed that Defendant Warden Hooper received it.

104.  At 4:20 p.m., Mr. Frampton reached out yet again to Defendant Vining, asking **"can you advise . . . when Bobby is due to hit the gate?"**   Defendant Vining did not respond.

105.  At approximately 4:33 p.m. co-counsel Justin Schmidt arrived at the gates of Angola and waited for Mr. Sneed's release.  About three minutes later, two other inmates walked out of the prison gates to the arms of loved ones, but Bobby Sneed was nowhere in sight.

106.  At that point, the following text message exchange occurred (Note:  All times in text messages are Easter Standard Time):

**[continued on next page]**



101.  Frantic emails to chambers ensued, and Judge Johnson's staff tried repeatedly to reach Defendants Vining, Walters and Willis (all licensed Louisiana attorneys) via phone, to no avail; they just ignored the judge's calls.

102.  Additionally, Mr. Frampton sent numerous emails to Defendants Vining, Walters and Willis, explaining that they were engaging in "contempt", to which Defendant Vining finally replied at 5:02 p.m.: **"Have a wonderful evening, sir! I assume your staff works 24/7 at your firm based on your comments!"**

103. Defendants Vining's, Walters', and Willis' conspired stalling tactics worked, as at 5:45 p.m., Defendant Walters emailed the others that he had "just received" a First Circuit Court of Appeal order temporarily staying Judge Johnson's "immediate release" order.

104. But for willful and wanton defiance of the trial court's orders, Mr. Sneed would have briefly tasted freedom for the first time in 47 years.

**h. Defendants' Intentional Defiance of Court Order Continues (Dec. 10)**

105. Although the Machiavellian deception exacted upon Mr. Sneed on December 9th was more than any 74-year old who had just served forty-seven (47) years in prison, and had at this point been unlawfully overdetained by 256 days, the events that unfolded the next day, Friday, December 10, 2021 was downright horrific.

106. At approximately 12:23 p.m. the next day, the First Circuit Court of Appeal denied Defendant Abbott's and Defendant Committee on Parole's writ application, reinstating the trial court's order to immediately release Mr. Sneed to parole.

107. Again, Mr. Sneed's supporters were literally waiting at the gates of Angola to pick him up (all time-stamps Eastern Time), and were again falsely assured that Mr. Sneed had been released:



108.   In fact, it was just more deception. As time ticked by (and Mr. Sneed was not released), it became increasingly obvious that these Defendants, licensed attorneys and officers of the Court, were intentionally and collectively making false statements and taking clandestine steps to again delay Mr. Sneed's court ordered release.

109.  Finally, about forty-five (45) minutes later (at 2:25 p.m. Central Time), Defendant Warden Hooper personally came out to announce that he would not be releasing Mr. Sneed, honoring a request from Board of Parole member Pearl Wise.

**i. Mr. Sneed's Extraordinary Ordeal Continues, But Now He's Housed in West Feliciana Detention Center, Based on a "Parole Violation Warrant" Unlike Any Other in Louisiana History**

110.   At the time, Defendants Abbott and Board of Parole refused to provide any information as what was happening with Mr. Sneed, but he eventually learned the following:

(1)    Later that night (December 10, 2021) Mr. Sneed was forcibly transported to West Feliciana Detention Center.

(2)    In direct violation of La. R.S. 15:574.7(D)—which requires parole violation proceedings to be initiated by a Parole Officer and then referred to the Board of Parole—Board of Parole Member Pearl Wise (one of the five members who participated in the sham May 10 "hearing") personally and individually ordered Mr. Sneed's arrest.

(3)    Respondents claimed that Mr. Sneed had a "Parole Date" of 03/29/21 and that he committed a "parole violation" approximately a month ago (November 9, 2021) while inside Angola prison.

111.  These actions, of course, directly contradict the December 7th and 9th rulings of the 19th Judicial District Court; and the December 10th ruling of the First Circuit Court of Appeal.

112.  Mr. Sneed was a *prisoner* at the time at the alleged parole violation (i.e., a man wrongfully deprived of "liberty" in violation of the Fourteenth Amendment), not someone exercising the "limited liberty interest" that *should have been* afforded a parolee.

113.  This rationale for imprisoning Mr. Sneed also contradicts the position that Defendant Board of Parole adopted in its December 13th  Application for Rehearing and December 14th Original Writ Application, in which they maintain (still) that Mr. Sneed was legally just an ordinary prisoner at the time of the alleged wrongdoing.

114.  At this point, Mr. Sneed not only remained detained, bewildered and confused in the West Feliciana Detention Center, but his grandson had recently been murdered and he had hoped to attend his funeral the upcoming Saturday, which was also his 75th birthday.

## II.    JURISDICTION AND VENUE

115. Plaintiff's claim arises under the Constitution and the laws of the United States. This Court has jurisdiction over Plaintiff's claims of federal rights violations, enforceable under the Fourteenth Amendment and 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's Louisiana false imprisonment claim in accordance with 28 U.S.C. § 1367.

116. The venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in Orleans Parish, Louisiana situated in the Middle District of Louisiana.

## III. THE PARTIES

*Plaintiff*

117.  Plaintiff **Bobby Ray Sneed** is of suitable age and capacity to file this suit. At all relevant time during this suit (aside from his false imprisonment at Angola and the West Feliciana Sherrif's Department ), Plaintiff was a resident of West Feliciana Parish in the Middle District of Louisiana.

*Defendants*

118.    Defendant **Louisiana Department of Public Safety and Corrections** is a independent department of the State of Louisiana.

119.    Defendant **James M. LeBlanc** is the Secretary for the Louisiana Department of Public Safety & Corrections and a final policymaker. He is sued in his individual and official capacities. On information and belief, he is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

120.    Defendant **Louisiana Board of Pardons and Committee on Parole** is independent Board of the State of Louisiana.

121.    Defendant **Francis Abbott** is the Executive Director of the Louisiana Board of Pardons and Committee on Parole. He is sued in his individual and official capacities. On information and belief, he is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

122.    Defendant **Sheryl M. Ranatza** is the Chair of the Louisiana Board of Pardons and Committee on Parole and a final policy maker. She is sued in her individual and official capacities. On information and belief, she is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

123.    Defendant **Anthony J. "Tony" Marabella** was a member of the Committee on Parole who sat on the panel that approved Bobby Sneed's parole on March 15, 2021.  He is sued in his individual and official capacities. On information and belief, he is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

124.    Defendant **Pearl Wise** is a member of the Louisiana Board of Pardons and Committee on Parole.  She is sued in her individual and official capacities.

125.    Defendant **Jeff Landry** is the Attorney General for the State of Louisiana and a final policymaker.  He also is the superior of two other named defendants, Assistant Attorneys General Chistopher N. Walters and Grant L. Willis.  He is sued in his individual and official

capacity. On information and belief, he is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

126.    Defendant **Christopher N. Walters** is an Assistant Attorney General for the State of Louisiana and represented defendant the Committee on Parole as well as Defendant Francis Abbott, Executive Director of the Louisiana Board of Pardons and Committee on Parole.  He is sued in his individual and official capacity. On information and belief, he is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

127.    Defendant **Grant L. Willis** is an Assistant Attorney General for the State of Louisiana and represented defendant the Committee on Parole as well as Defendant Francis Abbott, Executive Director of the Louisiana Board of Pardons and Committee on Parole.

128.    Defendant **Timothy Hooper** is the Warden of Louisiana State Penitentiary at Angola and a final policymaker. He is sued in his individual and official capacities. On information and belief, he is domiciled in West Feliciana Parish in the Middle District of Louisiana.

129.    Defendant **Jonathan R. Vining** is General Counsel to the Louisiana Department of Public Safety and Corrections as well as its Secretary, Defendant Secretary LeBlanc.

130.    Defendant **Governor John Bel Edwards** is the Governor of the State of Louisiana. He is sued in his individual and official capacities. On information and belief, he is domiciled in East Baton Rouge Parish in the Middle District of Louisiana.

131.    Defendant **Eric Turner** is an employee of the Louisiana Department of Public Safety and Corrections assigned as a corrections officer to the Louisiana State Penitentiary at Angola, Louisiana.

132.    Defendants **Does 1 to 10** are as-yet unknown individuals or entities involved in the overdetention of Bobby Ray Sneed and the damages to him caused thereby. They are sued in their official and individual capacities.

## IV.    CLAIMS FOR RELIEF

### Count One – Violation of Due Process Pursuant to U.S.C. 42 § 1983 (All Defendants)

133.    The Due Process Clause of the Fourteenth Amendment is violated when a prisoner is incarcerated without legal authority. *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980).

134.    Even if a prisoner is lawfully detained at the beginning of their incarceration, holding that prisoner beyond the period of their lawful sentence is a due process violation. *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

135.    Once a prisoner's lawful sentence has expired, a jailer is allowed a reasonable amount of time to process and release them, but that time must be well short of forty-eight hours to be considered reasonable. *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin*."). Once a detainee is ordered to be released, there is substantially less tolerance for "administrative delay" than in the context of arrestees awaiting probable cause determinations. *See Berry v. Baca*, 379 F.3d 764, 771-72 (9th Cir. 2004); *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir.2003); *Powell v. Barrett*, 376 F.Supp.2d 1340, 1353 (N.D.Ga. 2005).

136.   Even within a 48-hour period, the question of reasonableness is often left to juries and overdetentions as brief as 30 minutes have been found to violate the constitution. *See, e.g., Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (resulting in $100,000 jury verdict (upheld on appeal) for plaintiff for 1 hour overdetention at court holding cell and 2 1⁄2 hours at jail after release order); *Barnes, supra,* ("[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two and a half hour detention following acquittal presented jury question under Fourth Amendment).

137.   Here, Mr. Sneed's lawful detention expired on March 29, 2021 and when he was exonerated of all alleged charges on May 5, 2021, he should have been immediately released from Angola that day.

138.   Mr. Sneed contacted multiple employees of  the Department of Public Safety and Corrections,  filed a Writ of Habeas Corpus, a Motion for Immediate Release, and a Motion to Amend/Reconsider Sentence to correct the violation, but Mr. Sneed was detained until January 7, 2022, **288 days** beyond the expiration of lawful detention.

139.   As a result of that overdention, Mr. Sneed suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries.

140.   He lost another holiday season with his family and even missed the funeral of a grandson who was buried in December, 2021.

141.    By depriving Mr. Sneed of his fundamental right to liberty, Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As Defendants were acting under the color of state law, Plaintiff's claims are actionable under 42 U.S.C. § 1983.

### Count Two – Violations of the Louisiana Constitution (All Defendants)

142.    Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

143.    By reason of the same conduct that violated Bobby Sneed's federal constitutional rights, Defendants violated his state constitutional rights to liberty and due process.

144.    This conduct resulted in Mr. Sneed's overdetention and caused the physical, emotional, and pecuniary damages as described above and below.

### Count Three – State Law False Imprisonment (All Defendants)

145.    The tort of false imprisonment in Louisiana "occur[s] when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority." 353 So.2d 969 (La., 1977); *see also Miller v. Desoto Regional Health Sys*., 128 So.3d 649, 655-56 (La. App. 3 Cir. 2013). This has been distilled into "the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Thomas v. Gulotta* (M.D. La., 2017); *see also Kennedy v. Sheriff of E. Baton Rouge*, 935 So.2d 669, 690 (La. 2006).

146.    There is no need that the unlawful detention be an intentional act by Defendants or that there must be evidence of malice. *Fontenot v. Lavergne*, 365 So.2d 1168 (La.App. 3d Cir.1978);

*Prisk v. Palazzo*, 95–1475, pp. 4–5 (La.App. 4 Cir. 1/19/96), 668 So.2d 415, 417 ("The civil cause of action for false imprisonment requires proof of restraint without color of legal authority ... There is no requirement of proving that the confinement be intentional.").

147.   Here, Mr. Sneed was detained, which fulfills the first element.

148.   The second element – that the detention be unlawful – is fulfilled as Mr. Sneed was overdetained 288 days beyond his fixed Release to Parole Date of March 29, 2021 (the expiration of his lawful imprisonment). *See*, *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

**Count Four – State Law Negligence (All Defendants)**

149.   Plaintiff realleges and incorporates each and every foregoing paragraph.

150.   Defendants' conduct of overdetention described above caused Mr. Sneed harms as described above and below.

151.   Due to their professional roles as jailers, Defendants owed duties to avoid overdetention and other harms to persons in their custody, including Mr. Sneed.

152.   These duties were breached by Defendants' acts and omissions, including the failure to timely release Mr. Sneed even after the error was repeatedly brought to Defendants' attention.  A duty was also breached by Defendants.

153.   The risks and harms that Defendants caused were within the scope of protection afforded by the duties they owed to Mr. Sneed.

154.   As a result of Defendants' acts and omissions, Bobby Sneed suffered actual and foreseeable harm.

**Count Five – Failure to Intervene (All Defendants)**

155.  Plaintiff realleges and incorporates each and every foregoing paragraph.

156.  In the manner described above, during the constitutional violations described herein, one or more of the Defendants, including Louisiana licensed attorneys, stood by without intervening to prevent the further violation of Mr. Sneed's constitutional rights, even though they had the opportunity to do so, especially after the overdetention was brought to their attention by Mr. Sneeds legal counsel.

157.  In fact, Defendants Walters and Willis not only failed to intervene, but additionally continued to spread a false narrative regarding the facts surrounding Mr. Sneed's overdetention.

158.  Defendants Walter and Willis did this by making false representations in their pleadings and their oral arguments in various court proceedings.

159.  In addition, Defendant Vining also took affirmative steps toward the overdetention of Mr. Sneed on December 9th and 10th, 2021 when he repeatedly represented to Mr. Sneed's legal counsel that Defendant Hooper, Defendant Does, and were completing Mr. Sneed's release paperwork.

160.  As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Mr. Sneed suffered actual pain and injury, as well as emotional distress. Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

**Count Six – *Monell* and Failure to Train/Supervise (Timothy Hooper)**

161.  Plaintiff realleges and incorporates each and every foregoing paragraph.

162.   The misconduct described above was caused by the policies, practices, and customs of Defendants, in that their employees and agents regularly overdetain persons who are subject to release.

163.   The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of Defendants, were allowed to exist because policymakers with authority over there acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

164.   The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above. *See Hinojosa v. Livingston*, 807 F. 3d 657, 665 (5th Cir. 2015) ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."), quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

165.   Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents.

### Count Seven – *Respondeat Superior* (Timothy Hooper)

166.   Plaintiff realleges and incorporates each and every foregoing paragraph.

167.   While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of Marlin Gusman and acting within the scope of their employment.

168.   Defendant Marlin Gusman is therefore liable as principal for all torts committed by his agents.

## Count Eight – Indemnification (Timothy Hooper)

169.    Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

170.   While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of Marlin Gusman and acting within the scope of their employment.

171.    Defendants Marlin Gusman are therefore obligated by Louisiana statute to pay any judgment entered against its employees.

## Count Nine – Failure to Adopt Policies
### (James LeBlanc)

172.  Plaintiff realleges and incorporates each and every foregoing paragraph.

173.    "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir.1992).

174.   Defendant James LeBlanc is the Secretary and final policy-maker of the Department of Public Safety & Corrections.

175.   Mr. LeBlanc has not adopted any policy for the DOC requiring the timely processing of the release of inmates who have been awarded parole.

176.    As a result, paroled inmates, like Bobby Sneed, remain detained beyond bars when they should otherwise be enjoying the outside world under the terms of their parole.

177.    Therefore, it is the obvious consequence of Mr. LeBlanc's failure to adopt policy to see that paroled inmates are timely processed for release.

178.    Unless Mr. LeBlanc fashions a new policy for the DOC paroled inmates will continue to be predictably overdetained and illegally incarcerated in Louisiana prisons.

179.    Secretary LeBlanc's indifference to the adoption and implementation of meaningful procedures is corroborated by the Louisiana Legislative Auditor. On October 25, 2017, the Legislative Auditor released a report detailing an audit it had conducted into the Department of Public Safety & Corrections' management of inmate information. The report was entitled "Management of Offender Data: Processes for Ensuring Accuracy." The Auditor found that the "DOC does not have any policies, procedures, manuals, or agency-wide guidance that details the correct ways to calculate release dates." *Id.* at 13.

180.    In failing to adopt policy to prevent predictable overdetention, Mr. LeBlanc acted with deliberate indifference. This is evidenced by the fact that each week, for year after year, his staff would discover inmates that were supposed to be free – and yet Mr. LeBlanc did not create policy to fix the problem.

**Count Ten – *Monell* and Failure to Train/Supervise (James LeBlanc)**

181.   Plaintiff realleges and incorporates each and every foregoing paragraph.

182. The misconduct described above was caused by the policies, practices, and customs of Defendants, in that their employees and agents regularly overdetain persons who are subject to release.

183. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of Defendants, were allowed to exist because policymakers with authority over there acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

184. The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above. *See Hinojosa v. Livingston*, 807 F. 3d 657, 665 (5th Cir. 2015) ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."), quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

185. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents.

### Count Eleven – Failure to Train
### (James LeBlanc Only)

186. Plaintiff realleges and incorporates each and every foregoing paragraph.

187. A supervisor may be liable for failure to supervise or train if: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009).

188. Mr. LeBlanc did not train or supervise his subordinates in such a way as to require the immediate calculation of inmates' sentences. Nor did he train or supervise them in such a way as to triage inmates, focusing staffing resources on those inmates who had been sentenced with credit to time served.

189. But there are many other inmates for whom are overdetained for other reasons such as when the DOC incorrectly calculates time served.

190. Therefore, it is the obvious consequence of Mr. LeBlanc's failure to train and supervise that hundreds, if not thousands of inmates have been overdetained.

191. In failing to adopt policy to prevent predictable overdetention for parolees, as well as other classifications of inmates, Mr. LeBlanc acted with deliberate indifference. This is evidenced by the fact that each week, for year after year, his staff would discover inmates that were supposed to be free – and yet Mr. LeBlanc did not change his training or supervision to fix the problem.

### Count Twelve – Civil RICO (All Defendants)

192. Plaintiff realleges and incorporates each and every foregoing paragraph.

193. Plaintiff herein asserts his right to a private cause of action under 18 U.S.C. Section 1962 (c) and (d).

194. This complaint alleges, *inter alia,* violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961-1968, and is brought by plaintiff in connection with a series of schemes, devised, conducted and/or participated in by the individual defendants (sometimes referred to as the "defendant persons" or "RICO Defendants" or

"enterprise"), each of whom participated in the enterprise. The individual defendant persons conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering, and conspired to do so, all to the detriment of Mr. Sneed.

195.  During the relevant times set forth herein, the individual defendants conspired with one another to deny Plaintiff the freedom that parole would have afforded him. The multifarious racketeering activities through which the broad objectives of the individual defendants were carried out through interstate travel and the use of other instrumentalities of interstate commerce consisted of a complex pattern of individual transactions and groups of transactions.

196.    The enterprise, operating from March 25, 2021 to January 7, 2022, managed the day to day  in order to shield them from public scrutiny and federal oversight.

### V.    <u>RELIEF REQUESTED</u>

197.    The Plaintiff requests a trial by jury.

198.    Wherefore Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

a.   Declaratory relief;

b.   Judgment against Defendants for Plaintiff's asserted causes of action;

c.   Injunctive relief against Defendants to end their practice of overdetention;

d.   Award of compensatory damages;

e.   Award of special damages;

f.  Award costs and attorney's fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 28

C.F.R. § 35.175, and 29 U.S.C. § 794a(b);

g.  Order such other and further relief, at law or in equity, to which Plaintiff may be justly
entitled.

Respectfully submitted,

**THE LAW OFFICE OF JUSTIN B. SCHMIDT**

/s/Justin B. Schmidt
**JUSTIN B. SCHMIDT, LA Bar No. 25864**
1027 Ninth Street
New Orleans, LA 70115
Mobile: (504) 451-6567
Facsimile: (504) 899-9217
Email: Justinschmidtlaw@gmail.com

***Attorney for Bobby Ray Sneed***

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2022, a copy of the Plaintiff's *Complaint* was filed

electronically with the Clerk of Court via the CM/ECF system.  Notice of this filing will be

sent to all counsel of record by operation of the court's electronic filing system.

/s/Justin B. Schmidt